# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

CHEVELLE TINGEN,  
                 Plaintiff         :  
                             :  
                             :   CIVIL ACTION No. 02-4663  
      vs.                  :  
                             :  
ROBERT L. ECKLIN, JR., Individually and  :  
doing business as ECKLIN DEVELOPMENT  :  
GROUP and DENNIS SCHOPF,        :  
                 Defendants   :

## SUPPLEMENTAL APPENDIX TO MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

STEVENS & LEE

Gary D. Melchionni  
Joseph D. Shelby  
Suite 602  
25 North Queen Street  
Lancaster, PA 17603

Dated: October 13, 2003        Attorneys for Defendants

## TABLE OF CONTENTS

**Tab**                          **Description**

A.       Deposition of Robert L. Ecklin, Jr. (cited pages and Exhibit)

   1.       Deposition Exhibit E-7 (partial)

B.       Declaration of Melissa Obetz

C.       Deposition of Ruth Ecklin (cited pages)

# EXHIBIT A

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

CHEVELLE TINGEN                      :
                                     :
vs.                                  :   C.A. NO. 02-CV-4663
                                     :
ROBERT L. ECKLIN, JR.,               :
INDIVIDUALLY AND DOING               :
BUSINESS AS ECKLIN GROUP             :
AND DENNIS SCHOPF                    :

DEPOSITION OF ROBERT L. ECKLIN, JR.

produced, sworn and examined on May 23, 2003, at 10:30
A.M., at the Law Offices of Nina B. Shapiro, 53 North Duke
Street, Suite 201, Lancaster, Pennsylvania, before:

MARK E. BROWN, RPR-CSR
ANDERSON COURT REPORTING

APPEARANCES

For the Plaintiff:

Law Offices of Nina B. Shapiro
53 North Duke Street, Suite 201
Lancaster, PA 17603
BY:  NINA B. SHAPIRO, ESQ.

For the Defendants:

Stevens & Lee
25 North Duke Street, Suite 650
Lancaster, PA 17603
BY:  GARY D. MELCHIONNI, ESQ.

---

I N D E X

DEPONENT:                                              PAGE

ROBERT L. ECKLIN, JR.

    Examination by Ms. Shapiro                           3


E X H I B I T S

NO.         DESCRIPTION                                 PAGE

[PLAINTIFF'S]

E-1         depo notice                                   7
E-2 through E-7  various documents                       51
E-8         document                                     51
E-9         complaint                                    53
E-10        various documents                            99
E-11        packet                                      109
E-12        document                                    110

COPY

---

(COMMENCED AT 10:30 A.M.)

STIPULATION

It is hereby stipulated by and between counsel
for the respective parties that sealing, certification,
and filing are hereby waived and that all objections
except to the form of the question are reserved to the
time of trial.

ROBERT L. ECKLIN, JR.

Being duly sworn, deposed and testifies as follows:

EXAMINATION BY MS. SHAPIRO

Q    Today is Friday, May 23rd, 2003.  This is in the
matter of Chevelle Tingen versus Robert L. Ecklin, Jr.,
individually and doing business as Ecklin Group and
Dennis Schopf, the defendants.

     Good morning, Mr. Ecklin.  Today is the
deposition for you and for the record, your counsel is
Gary Melchionni?

A    Yes.

Q    Of Stevens and Lee?

A    Yes.

     MS. SHAPIRO:  Let me just ask one business
question.  Did Mr. Newcomer ever file a notice to
withdraw?

     MR. MELCHIONNI:  Yes, he did.

     MS. SHAPIRO:  I'm not sure if I ever got that.

---

I do have your appearance.

     MR. MELCHIONNI:  I will make a note.

     MS. SHAPIRO:  I will check the record and if I
need it for Dennis Schopf's, I will leave you a
message because I don't think we ever got that from
him.

     MR. MELCHIONNI:  He did file a --

     MS. SHAPIRO:  I'm not contesting it because you
did file one but I don't know if I ever received it.
Okay.

Q    Let me first start, Mr. Ecklin, have you ever
been deposed before?

A    Yes.

Q    How many times?

A    I can think of once.

Q    One other time.  How long ago?

A    That was within the last six months.

Q    And what kind of case was that?

A    I really don't know.  I was asked to appear and
depose and I am not familiar with the details of the
case.

Q    Were you a party to the case?

A    I was not.

Q    Were you subpoenaed?

A    No.

---

**9**

1  defendant's employment with Ecklin Group including
2  without limitation all time records, performance
3  appraisals, job descriptions and all other documents
4  which comprise defendant's personnel file and otherwise
5  referenced in initial disclosure of defendant Robert L.
6  Ecklin, Jr.
7      Did you ever see the self-executing disclosures
8  that were presented by prior counsel to my attention?
9      A   No. I'm not sure what you mean by self --
10     Q   Executing disclosures. Let me show you what had
11  been presented to my attention by prior counsel,
12  Mr. Newcomer, and these were initial disclosures of
13  defendants. Have you ever reviewed that?
14     A   No.
15     Q   In looking through this, do you know what was
16  presented to me today?
17     A   I do not.
18     Q   Why don't we just go through and you can
19  identify for the record everything that has been
20  presented so I have some basis here.
21      The first document which is titled Certificate
22  of Organization, Domestic Limited Liability Company, and
23  I'm going to want to have all these marked.
24      What I will do is have them identified, I will
25  have my secretary make a copy and what I will do is have

1  that whole packet then marked and before you leave
2  since she will be working on this while we're doing
3  this, let's just make sure that it is a true and correct
4  copy and I have included everything. Can you identify
5  the first document?
6      A   Certificate of Organization, Domestic Limited
7  Liability Company.
8      Q   And that is for what company?
9      A   Ecklin Development, LLC.
10     Q   Did you produce that to your attorney's
11  attention?
12     A   Yes.
13     Q   And that being a two-page document. Is that
14  your signature on the second page, sir?
15     A   Yes, it is.
16     Q   And that was filed 3/27/1998? Actually, I
17  believe the specific date filed with the corporation is
18  probably March 30th of 1998. Is that when it was filed?
19     A   I don't know. That's the date on the document.
20  I don't really know.
21     Q   Okay. I believe this is -- is this a
22  four-page -- will you look through this and identify
23  this grouping and make sure that I have placed a paper
24  clip around the proper documents. Can you identify the
25  grouping?

**11**

1      A   This is a Pennsylvania Department of State
2  Corporation Bureau application for registration of
3  fictitious name.
4      Q   And that is how many pages together?
5      A   Four.
6      Q   And that was pertaining to which company?
7      A   Ecklin Group is the fictitious name filing.
8      Q   Okay. Seven pages. And what filing is that?
9      A   This is a certificate of incorporation.
10     Q   For which business?
11     A   Stoner Incorporated.
12     Q   And inclusive, could you go through each page?
13  What is the second page? There is only one copy.
14     A   Board of directors meeting.
15     Q   And for what year? What is the date on that?
16     A   April 1st of 1996.
17     Q   Okay. Can I see that document for a second?
18  And is that pertaining to you -- it was decided that you
19  were now the president? The directors decided?
20     A   Of --
21     Q   Why don't you read it out loud here and then you
22  can explain.
23     A   Is that a question?
24     Q   I'm asking you to read it out loud and if I have
25  further questions.

1      A   Okay. Meeting called for the purpose of
2  election of officers for Stoner Incorporated. Directors
3  Robert L. Ecklin, Jr. and Lottie R. Stoner voted to fill
4  the vacant position of president. Directors decided on
5  Robert L. Ecklin, Jr. as president and secretary of
6  Stoner Incorporated and Lottie R. Stoner was elected
7  stay on as treasurer of the company.
8      Q   And is that when you were -- it was decided that
9  you would be the president?
10     A   Yes.
11     Q   Are there -- how many directors were present at
12  that meeting?
13     A   Two.
14     Q   And that was Lottie?
15     A   Yes, and myself.
16     Q   Is that your mother?
17     A   Grandmother.
18     Q   Grandmother. Paternal?
19     A   Maternal.
20     Q   Okay. Next page. That is the stock redemption
21  agreement. Can you read in that date? I don't believe
22  it's clear.
23     A   It looks like the 1st of January of 1996.
24     Q   Okay. Let me see if I have any further
25  questions on that.



13

1 Now, I see there are deletions in this document.
2 Do you know who has deleted information?
3 A No.
4 Q Do you know if it was your attorney who deleted?
5 A No.
6 Q Did you give this document to your attorney with
7 deletions?
8 A No.
9 Q So you don't know?
10 A I don't.
11 Q Okay. All right. And it appears on the second
12 page that there is a signature by president and that is
13 very, very faint. Is that your signature?
14 A Yes.
15 Q Okay. All right. Put that down and go to the
16 next one.
17 A Okay.
18 Q Go ahead. What is that one?
19 A Annual shareholders meeting, March 15th of 1999.
20 Q And who was present in that meeting?
21 A Myself, Robert Ecklin, Jr.
22 Q Anyone else?
23 A No.
24 Q Are there other shareholders --
25 A No.

14

1 Q -- other than yourself? And that is in
2 particular to which corporation?
3 A Stoner Incorporated.
4 Q For the record, what is exactly Stoner Inc.?
5 A Stoner Inc. is a manufacturing company located
6 in Quarryville, Pennsylvania.
7 Q They have been in existence how long?
8 A Since the -- some time in the 1940s.
9 Q And that was started by a relative?
10 A Paul Stoner.
11 Q Grandfather?
12 A Yes.
13 Q Is that Lottie's husband?
14 A It is.
15 Q And what do they manufacture?
16 A They manufacture lubricants for industrial use.
17 Q What is the exact address for them?
18 A 1070 Robert Fulton Highway, Quarryville,
19 Pennsylvania, 17566.
20 Q How many employees are working at the Stoner
21 Inc. facility?
22 A About 45.
23 Q And this is a manufacturer?
24 A Yes.
25 Q How wide a sales base do they have?

15

1 A We sell nationally.
2 Q Do you know the net profit for the company this
3 past year?
4 A No.
5 Q Are they listed on the stock exchange?
6 A No, privately held.
7 Q Do you know the net worth of the company?
8 A No.
9 Q Does the company file tax returns?
10 A Yes.
11 Q And who is the accountant for the company?
12 A Sager and Swisher, LLP.
13 Q Do you want to spell that for the court
14 reporter?
15 A S-a-g-e-r and S-w-i-s-h-e-r.
16 Q Does Sager Swisher also prepare the financial
17 statements?
18 A Yes.
19 Q Does it sell internationally?
20 A Very little.
21 Q Okay. Next one, what do you have there?
22 A Annual shareholders meeting for March 15th of
23 2000.
24 Q Also for Stoner?
25 A For Stoner Incorporated, yes.

16

1 Q And how many individuals were present at the
2 stockholders meeting?
3 A One.
4 Q Yourself?
5 A Yes.
6 Q Am I correct, did you say you were the sole
7 shareholder?
8 A Yes.
9 Q So your grandmother has no more interest in
10 company?
11 A She does not.
12 Q Okay. Continue. And that is the organization
13 structure. What is the date of that organizational
14 structure?
15 A May 2000 for Stoner Incorporated.
16 Q Has the structure changed from 2000 until too
17 A No.
18 Q So it is the same organizational structure?
19 A Yes.
20 Q May I see that? Do you maintain an office at
21 Stoner?
22 A Yes.
23 Q How often are you at Stoner Inc. on any week
24 basis?
25 A Between one and maybe two days a week.

17

```
1    Q    Now, when you say one to two days a week, is
2    that one full day or are you estimating that one day
3    would be all the hours that you would put in for the
4    whole week?
5    A    It's normally one full day a week and then
6    possibly a second of a variation.  It depends on the
7    week.
8    Q    Does Stoner Inc. have personnel manuals?
9    A    Yes.
10   Q    Did you bring any of those today, do you know?
11   A    I don't know.
12   Q    Okay.  We will go through this.  How many years
13   have you had personnel manuals for Stoner Inc.?
14   A    I don't know.
15   Q    Is there an HR department -- human resources and
16   personnel department at Stoner?
17   A    No.
18   Q    Who at Stoner Inc. is responsible then for all
19   the hiring and firing and that kind of --
20   A    It depends on the department, on the team.
21   Q    So each team then -- and the team would be
22   marketing, sales, inside sales, information and
23   technology, technology, manufacturing and logistics?
24   A    Yes.
25   Q    Okay.  They sort of govern themselves?
```

```
1    A    Yes.
2    Q    Have you -- strike that.  When was the last time
3    that you reviewed the personnel manual for Stoner Inc.
4    A    I don't remember.
5    Q    Do you recall if there was a personnel manual
6    existence in the year 2000 for Stoner Inc.?
7    A    I don't recall.
8    Q    Is that the compilation?
9    A    Yes.
10   Q    Now, I will let her start doing this and while
11   I'm doing that, if you will go through this and see if
12   there is a personnel manual in that pile.
13                    (INDISN  TAKEN)
14   Q    Did you review this pile?
15   A    No.
16        MR. MELCHIONNI:  For the record, there are
17   personnel manuals in the documents that we have
18   produced today.
19   Q    But just so I'm correct, you're saying that
20   there are personnel manuals that you know of?
21   A    What do you mean by a personnel manual?
22   Q    What did you think I meant by it?  You had said
23   that there are personnel manuals.
24   A    Individual employee records.
25   Q    Okay.  No.  I meant, do you have a handbook
```

19

```
1    A    For?
2    Q    For employees.  If I meant for each individual,
3    I would have said a personnel file.  Do you have any
4    handbooks?
5    A    For what?
6    Q    Any personnel matters such as when you can take
7    vacation time.
8    A    We do have a handbook at Stoner Incorporated.
9    Q    And am I correct that that handbook at Stoner
10   was not produced today, correct?
11   A    Yes.
12        MR. MELCHIONNI:  That's correct.
13   Q    What to your recollection is in that handbook?
14   What does it encompass?  What subjects?
15   A    Vacation time, explanation of benefits, that
16   would be about it.
17   Q    Okay.  Does Stoner have a disciplinary policy or
18   procedure?
19   A    Are you asking in the handbook?
20   Q    Well, first I'm asking if it does and then I'm
21   going to ask you if it's in the handbook.
22   A    It does.
23   Q    Is that in the handbook?
24   A    I don't know.
25   Q    What is at Stoner for the disciplinary process?
```

```
1    A    For what?
2    Q    Any discipline.
3    A    Explain discipline to me.
4    Q    Well, you said that there was a process there.
5    My understanding of discipline is any violation of
6    either company policy or conduct at the plant.  Is that
7    your same understanding of what would be discipline?
8    A    It would depend on the nature of the discipline.
9    Q    Okay.  Is that a published policy taking into
10   account that there could be --
11   A    I don't know.
12   Q    -- variation?
13   A    I don't know if it is published.  I don't know.
14   Q    So when you say there is a policy, can you
15   explain what policy you know of regarding any type of
16   discipline at Stoner?
17   A    I can if I knew specifically what type of
18   discipline you are asking for.  Are you talking about an
19   employee coming in late for work?
20   Q    Is there -- okay.  We can break it down that
21   way.  Is there a policy for when employees come in late
22   to work?
23   A    No.
24   Q    Is there a policy for unexcused absences,
25   attendance issues?
```

21

1   A   It depends.
2   Q   What does it depends on?
3   A   It depends on how severe the unexcused absence
4   is.
5   Q   So is this something more on an individual basis
6   that you would determine whether discipline is
7   appropriate or not?
8   A   Mostly.
9   Q   Okay. And who would determine? Is that
10  something you would determine as the president?
11  A   No.
12  Q   Who would determine that?
13  A   Normally a team leader.
14  Q   And do they make a written recording of any
15  discipline?
16  A   I don't know.
17  Q   Who would know? Who would know what the
18  policies and procedures at Stoner are?
19  A   Individual employees.
20  Q   You have on your organizational chart which is
21  being Xeroxed a general manager. Is that the individual
22  that runs Stoner and operates Stoner on a daily basis?
23  A   He does.
24  Q   And he reports to you?
25  A   Yes.

1   Q   His name again, please?
2   A   Rob Marchalonis.
3   Q   Has he ever brought to your attention
4   disciplinary issues in the plant?
5   A   No.
6   Q   Does each employee at Stoner have a perso
7   file?
8   A   I don't know.
9   Q   Would Rob Marchalonis, would he know all o
10  that?
11  A   Not necessarily.
12  Q   Okay. Do you have a harassment policy the
13  A   I don't know.
14  Q   Is there any policy if, in fact, one employee is
15  harassing another employee?
16  A   Yes.
17  Q   Is that a written policy?
18  A   I don't know.
19  Q   How do you know that there is a policy?
20  A   Because if an employee would be harassing
21  another employee, it would be a situation that would
22  have to be dealt with.
23  Q   Okay. So the fact that it has to be dealt with,
24  that in and of itself makes it a policy?
25  A   Yes.

23

1   Q   And who would deal with it?
2   A   Depends on the situation and the employee.
3   Q   Why would it depend on the situation and
4   employee?
5   A   Because depending on where it happened and in
6   what location and under what team, for example, it would
7   involve typically those people that were affected by it
8   and that immediate team leader.
9   Q   Would that team leader report to the general
10  manager if such harassment was going on?
11  A   It depends on the team leader.
12  Q   They wouldn't have to report that?
13  A   If – repeat the question.
14  Q   If there is alleged harassment going on, would
15  that team leader have to report that to the general
16  manager?
17  A   It depends on the level of harassment.
18  Q   Now, are you speaking off the cuff today or are
19  there particular policies or some written record that
20  you would be referencing for that? Did I lose you?
21  A   Yes, I don't understand.
22  Q   When you say something depends, are you saying
23  it depends because it depends on how would you view it
24  or is there something in written form at Stoner that
25  would give you some guidance?

1   A   Depends on the level of harassment. You're
2   using harassment in a general word. I view that as a
3   variety of issues.
4   Q   How about in a situation where an employee
5   alleged that he or she is being sexually harassed,
6   pressured by their superior, their supervisor to engage
7   in acts of sexual nature?
8   A   And the question is?
9   Q   Okay. Would that then -- how would that be
10  dealt with at Stoner?
11  A   That would normally involve the team leader
12  and/or supervisor and general manager.
13  Q   Okay. Is there a sexual harassment policy tha
14  is written at Stoner?
15  A   It's possible but I am not aware of it today.
16  Q   Who would know? Would that general manage
17  if there was something written?
18  A   He would. I would know if I read the policy
19  manual.
20  Q   Okay. And the policy manual that you're
21  referring to, is that the employee handbook or is that
22  something separate?
23  A   Employee handbook.
24  Q   Okay. Do you have written guidelines for
25  supervisory staff at Stoner?

**25**

1   A   I don't understand the question.

2   Q   Okay. You have about five or six teams if I'm

3   recalling correctly and they all have, I believe,

4   someone at the top who is the team leader?

5   A   Yes.

6   Q   Are they -- are there written guidelines for

7   team leaders how they are supposed to dispense rules or

8   policies?

9   A   Only what would be in the employee handbook.

10  Q   Are you aware of any sexual harassment posters

11  posted at Stoner?

12  A   I am not.

13  Q   Do you post policies regarding a work injury --

14  reporting a work injury at Stoner?

15  A   Without looking, I don't know.

16  Q   Okay. All right. Why don't we go forward on

17  the next one here.

18  A   This is a birthday card.

19  Q   No. How did you come to have that birthday card?

20  A   It was in the pile.

21  Q   Did you review it before today?

22  A   No.

23  Q   Do you know anything about that card?

24  A   Well, I know that it was signed by Chevelle and

25  it was addressed to Dennis.

---

1   Q   So Dennis would know about the card?

2   A   Yes.

3   Q   Okay. Next one. I will give her a packet whe

4   we get through.

5   A   It's a photograph.

6   Q   That is a photocopy of a photograph?

7   A   Yes, photocopy of a photograph, I'm sorry.

8   Q   That's okay. I just want to be specific. And

9   is it dated?

10  A   It is not.

11  Q   Do you know who took that photograph?

12  A   I do not.

13  Q   Do you know where that photograph was tak

14  A   I do not.

15  Q   Do you know the individuals in the photograp

16  A   I do not.

17  Q   Okay.

18  A   It's not a very good copy.

19  Q   No. I guess for a regular copier, it's probably

20  better that you expect. Do you know where the origin

21  is of this picture?

22  A   I do not.

23  Q   All right. What packet do we have here?

24  A   I don't know.

25  Q   Could that be -- and I don't want to put words

---

**27**

1   in your mouth but could that be documents relating to

2   Chevelle Tingen when she was employed?

3   A   Some documents are related to employment, yes.

4   Q   At Ecklin Group, did you have personnel files

5   for each employee?

6   A   Yes.

7   Q   Is that Chevelle Tingen's personnel file?

8   A   I would assume it is.

9   Q   Okay. Did you put that document together, that

10  packet of information?

11  A   I did not.

12  Q   Do you know who did?

13  A   No.

14  Q   What do you base your assumption on that that is

15  Chevelle Tingen's personnel file?

16  A   There is various records and correspondence here

17  relating to Chevelle Tingen, 401-K information, letter

18  of resignation, 401-K disbursement information, Human

19  Relations Commission filings, health insurance coverage

20  report for Chevelle Tingen.

21  Q   Okay. Are there any payroll records in there?

22  A   I don't know. There is a lot of information

23  there.

24  Q   Okay. Is it your practice at -- well, first at

25  Stoner, is it your practice to have personnel

---

1   appraisals -- performance appraisals?

2   A   At Stoner, no.

3   Q   What about at here at Ecklin Group?

4   A   Yes.

5   Q   Are there any performance appraisals in there

6   A   I don't know.

7   Q   Okay. Let me have her copy it and we will ha

8   to go through it. Now, what exactly is Ecklin Group?

9   A   Ecklin Group owns and operates real estate ir

10  Downtown Lancaster.

11  Q   And you're the president?

12  A   Owner.

13  Q   Owner. The sole owner?

14  A   Yes.

15  Q   How many properties does Ecklin Group curre

16  own in Lancaster?

17  A   I don't know. More than ten.

18  Q   And this is inclusive of both commercial and

19  residential?

20  A   Yes.

21  Q   Does that also include the Griest building?

22  A   Yes.

23  Q   What is then the net worth of all the buildings?

24  A   I don't know.

25  Q   Is there some listing then that you have that

---

101

1  collections for the real estate properties.
2     Q   So the employees got a percentage?
3     A   Yes.
4     Q   What percentage did Dennis get?
5     A   I don't --
6     Q   Did it change from year to year?
7     A   It can.
8     Q   Did Chevelle also get a bonus then?
9     A   Yes.
10    Q   Plus didn't she work usual overtime?
11    A   I believe she did have overtime hours.
12    Q   So I have from 1999, actually he got less that
13 year. '98, '97, '96 and '95. And I believe all of them
14 say employee 15.
15       Let's go to the performance appraisals. Am I
16 correct that there should be performance appraisals for
17 Chevelle?
18    A   I did not do her -- any performance appraisals
19 for Chevelle.
20    Q   Okay. So all she would have is these payroll --
21 she wouldn't have something like these development and
22 reviews?
23    A   Not that I'm aware of.
24    Q   Would you know if, in fact, Dennis Schopf would
25 prepare any as her supervisor?

---

1     A   I know they sat down annually to review wage
2 I'm not familiar whether they have any written
3 discussions of that.
4     Q   You didn't require anything of him to do that?
5     A   Written?
6     Q   Anything like this?
7     A   I did not.
8     Q   Are there job descriptions, published job
9 descriptions?
10    A   No.
11    Q   So that -- let me understand that Chevelle an
12 Zulma who would report to Dennis then would do wha
13 he would ask them to do for the evening?
14    A   They generally knew what to do for the evenin
15 We really work as self-directed work teams and Chev
16 and Zulma were the cleaning team for the Griest
17 building.
18    Q   During the time that Chevelle was employed,
19 you have any performance issues about Chevelle?
20    A   None that we documented.
21    Q   Did have you a practice, though, of document
22 any performance issues?
23    A   If they were severe enough, we would have
24 documented them.
25    Q   Did Dennis bring anything to your attention?

---

103

1     A   About?
2     Q   Chevelle performance-wise
3     A   No.
4     Q   So if you had any, that was based from something
5 you observed?
6     A   Or if there was a complaint that came up through
7 the organization.
8     Q   Did you receive any complaints?
9     A   About what?
10    Q   Chevelle.
11    A   No.
12    Q   Did you receive any commendations about her?
13    A   I don't understand the question.
14    Q   Did you receive any praise about her, the work
15 that she did, that she was friendly or anything like
16 that?
17    A   Not that I recall. Normally tenants would
18 respond mostly negatively if there was a problem.
19    Q   They are not going to give you anything good,
20 right?
21    A   Yes, they do at times but I don't recall any
22 specific praise for Chevelle.
23    Q   Or complaints?
24    A   Or complaints.
25    Q   Her attendance was good?

---

1     A   Yes, it wasn't perfect but it was okay. It was
2 acceptable.
3     Q   And she willingly did overtime?
4     A   Yes.
5     Q   Now, in looking at this Dennis Schopf
6 development and review dated August 22nd of 2000.
7     A   Okay.
8     Q   On the very last line, is that what you
9 reference before this is all contingent pending the
10 outcome of Chevelle Tingen?
11    A   Yes.
12    Q   And the salary review, that is then a
13 chronological history?
14    A   Yes.
15    Q   Of how long he has been working?
16    A   Yes.
17    Q   And those job accomplishments, did you write
18 those in?
19    A   Yes.
20    Q   Is it fair to say that Dennis knows the Griest
21 building very well?
22    A   Yes.
23    Q   Pretty much need him there, don't you?
24    A   Yes.
25    Q   Have you ever had any complaints about Denni

105

```
1   from tenants?
2      A   No, actually only praise.
3      Q   And who was the praise from?
4      A   Various tenants.
5      Q   Can you identify them?
6      A   No, I can't. Various tenants would say
7   maintenance job completed on time or a build-out, nice
8   job on a build-out or, you know, mostly positive.
9      Q   When you say mostly positive, were some of them
10  not?
11     A   Never had a negative comment on Dennis.
12     Q   Now, when you say on the very bottom this is all
13  contingent pending the outcome of Chevelle Tingen, did
14  you have any further documentation for the coming -- the
15  following years about any other references to the
16  outcome of Chevelle Tingen?
17     A   No.
18     Q   For the year 2001, do you have anything
19  referenced in there regarding how late it was in the
20  game when Dennis came forward that, in fact, he had had
21  relations with Chevelle Tingen?
22     A   I don't recall anything documented on that, no.
23     Q   You stated that you were concerned that he had
24  given you that information late in the game but I'm
25  correct, you didn't do anything about that?
```

```
1      A   I didn't state that.
2      Q   What did you state?
3      A   Are you referring to my -- back to my
4   handwritten notes?
5      Q   When I asked you that it was six months after
6   the fact --
7      A   Okay.
8      Q   -- that Dennis then, you know, disclosed to you
9   for the first time that, in fact, he had relations and
10  that was of concern to you, rightly so, but you didn't
11  do anything about that?
12     A   No. As I said, Dennis was represented by
13  attorneys and I was assuming they were having
14  attorney/attorney conversations and that's what I knew
15  at the time.
16     Q   In January of 2001, do you recall Dennis being
17  separately represented?
18     A   I don't remember.
19     Q   Is it possible that he might not have been
20  separately represented at that time?
21     A   I don't recall.
22     Q   And my understanding is now that your attorney
23  is also representing Dennis?
24     A   Yes.
25     Q   Do you have any insurance coverage under this
```

107

```
1   case?
2      A   Not that I'm aware of.
3      Q   Did you research that?
4      A   Research what?
5      Q   If any insurance coverage is available.
6      A   I think Mel did, yes. I remember conversations
7   about it. I'm not aware of any insurance coverage.
8      Q   When else do you have over here? Let's finish
9   going through that.
10     A   Are you asking me?
11     Q   Yes.
12     A   Health plan for Ecklin Group, effective date of
13  coverage 6/1 of '95. It looks like another healthcare
14  plan for Ecklin Group, coverage 4/3/98. It looks like
15  workman's compensation coverage for Ecklin Group.
16     Q   Is that workers' comp?
17     A   Yes.
18     Q   Who is your workers' comp carrier?
19     A   Erie Insurance.
20     Q   And do you have a policy number for that?
21     A   It's all on here.
22     Q   Well, he is taking them back so I will have to
23  make copies of them. Can we make copies and present
24  them back to you?
25        MR. MELCHIONNI: How about I will take them back
```

```
1   and make a set for you.
2        MS. SHAPIRO: That's fine.
3      Q   Keep going.
4      A   This is a -- I don't know what this is. Policy
5   effective date 3/14/99 workman's comp.
6      Q   Okay. Are these all insurance documents?
7      A   These are all insurance. This looks like
8   another workman's comp for '99. Workman's comp for
9   2000. This looks like an Ecklin Group 401-K profit
10  sharing plan document.
11        Adoption agreement for Trefsgar and Company
12  standardized 401-K profit sharing plan and trust plan.
13  This is a document where I signed up for 401-K plan for
14  Ecklin Group.
15        This is a plan description for the 401-K plan
16  for Ecklin Group. Another plan description for the
17  401-K plan for Ecklin Group.
18        This is an Educators Mutual Life Company summary
19  of benefits for Ecklin Group. This looks like this
20  would be for life and health insurance.
21        Ecklin Group life insurance plan from Educators
22  Mutual Life, effective date 6/1/98. An Ecklin Group
23  Educator Mutual Life medical insurance benefit book for
24  policy effective date of 6/1 of '98.
25        This is an audit statement on workman's comp
```

109

1  Ecklin Group from Erie Insurance. Renewal certificate

2  for Ecklin Development for — I believe this is for

3  insurance on the Griest building. An Ecklin Group 401-K

4  profit sharing plan summary plan description.

5  Q  And I see on the back it is --

6  A  From Trefsgar and Company. A long-term

7  disability plan from Unum for Ecklin group. A

8  short-term disability plan from Unum for Ecklin Group.

9  Ecklin Group insurance coverage for Griest building

10  insurance effective June 1st, 2000.

11  Q  Why don't we then just label the whole kit and

12  caboodle here that is left as Exhibit No. 11.

13  [PLAINTIFF'S EXHIBIT E-11 MARKED

14  FOR IDENTIFICATION]

15  Q  Am I correct that that is the same benefits for

16  Stoner?

17  A  We had the same vendor. I'm not sure about the

18  details of the benefits.

19  Q  Okay. You told me that you were — this is the

20  initial disclosure that was presented by your prior

21  counsel. The individuals listed were yourself, Dennis

22  Schopf, Zulma Cora and Charlene. How does she pronounce

23  her last name?

24  A  Kulesa.

25  Q  Are there any other individuals that you would

---

1  add to this list that would know anything

2  discoverable — have anything to do with the claims o

3  the defenses?

4  A  No.

5  Q  Mark or JR?

6  A  No, not really.

7  Q  Okay. Why don't we mark this. It is a copy o

8  your answer that was filed by prior counsel. I

9  apologize for the upside down page.

10  [PLAINTIFF'S EXHIBIT E-12 MARKED

11  FOR IDENTIFICATION]

12  Q  Let me first ask you, did you review this answ

13  before Mel Newcomer had filed it?

14  A  I don't remember.

15  Q  I can give you a moment to read it.

16  A  I don't recall this. I was aware of the

17  paperwork being filed.

18  Q  You knew he was filing an answer?

19  A  Yes.

20  Q  Okay. Have you ever read the complaint?

21  A  Yes. You mean the original complaint?

22  Q  The federal complaint.

23  A  I don't know. I don't know. There has been s

24  many back and forth, I'm not sure which is which.

25  Q  Let me just draw you to the second page and.

---

111

1  once again, I apologize it being upside down. The

2  answer by your counsel is there is no entity known as

3  Ecklin Development Group and that Ecklin Group is a

4  fictitious name registered.

5  A  Yes.

6  Q  So we will keep going with the Ecklin Group.

7  Okay. Going to the third page, paragraph 18, counsel

8  has denied and said, on the contrary, Dennis Schopf did

9  not demand that plaintiff perform sexual acts on him,

10  including sexual intercourse and oral sex.

11  Do you know where your attorney based that

12  denial — what facts he is basing that denial on?

13  A  I don't.

14  Q  Going to 19, it says denied. On the contrary,

15  Defendant Schopf did not threaten plaintiff in any way.

16  By way of further answer, the Defendant Ecklin avers

17  that Defendant Schopf did not have the ability to affect

18  Plaintiff's job security or conditions of employment.

19  Am I correct that only Dennis assigned Chevollo

20  work?

21  A  Yes.

22  Q  So do you have any idea where your attorney got

23  that information to write that denial, or what facts he

24  is basing that?

25  A  I don't.

---

1  Q  Okay. On number 20, once again, your attorn

2  denied. On the contrary, Defendant Schopf did not

3  engage in the alleged conduct, therefore, there was n

4  occasion in which Plaintiff indicated that she did not

5  went to engage in the conduct.

6  Do you have any idea where your attorney -- w

7  facts he is basing on for that denial?

8  A  I don't.

9  Q  Number 21, denied again. On the contrary,

10  Defendant Schopf did not demand from Plaintiff or

11  perform with Plaintiff any sex acts in any offices in

12  the Griest building.

13  Do you know where your attorney -- what facts

14  is basing that denial on?

15  A  No. Any of these based on conversation that I

16  and I would have had is my assumption.

17  Q  So you will guess he got these facts from you?

18  A  Um-hum.

19  Q  But you don't know for sure?

20  A  Well, what I know for sure is we have had

21  several conversations about the case and he filled out

22  the complaints based on the question asked and this is

23  how he filled them out.

24  Q  And you did not review this beforehand?

25  A  I don't remember honestly if I reviewed this

---

113

1  particular document or not.

2  Q   So your answer would be the same on as far as

3  the denial that if Dennis Schopf returned to business to

4  the building was because of responsibilities of

5  employment and not because of Chevelle Tingen, you would

6  agree that that would be the same answer?

7  A   Yes.

8  Q   And the same that Dennis Schopf on number 24

9  neither followed plaintiff nor stalked her after work?

10  A   Yes.

11  Q   The same on number 28, that on the contrary,

12  there was no sexual harassment by Dennis Schopf?

13  A   Yes.

14  Q   Now number 33, when you have here on the

15  contrary, Dennis Schopf did acknowledge that he had a

16  relationship with Plaintiff and that would be outside of

17  work, that is the January 2001 conversation you had with

18  him when he disclosed that, is that what you're

19  referring to?

20  A   I think we were referring to many conversations

21  in disclosing that that Dennis came forth and discussed

22  and provided evidence that he had a relationship with

23  Chevelle outside of work.

24  Q   Okay. But that was the first time that you

25  learned of it was January of 2001 according to your

---

notes?

1  A   Yes.

3  Q   Now, it has -- the next line your attorney

4  clarified, it is further denied that Defendant Schopf

5  was untruthful with Defendant Ecklin in any meeting

6  prior to Plaintiff's resignation. What about after she

7  resigned, was Dennis Schopf untruthful to you?

8  A   No.

9  Q   So you don't believe that he was untruthful w

10  he was not straight about his relationship with Cheve

11  when you were doing your interview that July and Au

12  of 2000?

13  A   No.

14  Q   And, once again, you told me you never aske

15  if he had a relationship with her at that time?

16  A   I did not. Not that I recall. I think I would

17  have noted that in writing if I had asked that and if it

18  was answered or not answered.

19  Q   And you don't recall why you didn't ask that

20  question in light of the allegations?

21  A   No.

22      Are you also an owner of Details or is that you

23  wif...

24      That is my wife.

25      Is she an employee of Ecklin?

---

115

1      No.

2      I'm going to reserve the right on the -- you

3  didn't bring me the tax returns so I will reserve the

4  right to bring you back on that matter and any other --

5  let me just see if there is anything else in there.

6      MR. MELCHIONNI: It's been a while, I don't know

7  whether I stated this on the record but with respect

8  to the tax returns, certainly at this stage of the

9  proceedings, it is our position that you are not

10  entitled to them.

11  Q   Do you have any documents -- I have asked you on

12  Exhibit A, any and all documents which support the

13  absence of any sexual harassment and sexual assault as

14  referenced in your initial disclosure statement. Do you

15  have any documents to support that there was no sexual

16  harassment?

17      MR. MELCHIONNI: Other than what was already

18  provided?

19  Q   Yes, other than what was provided.

20  A   I don't have any more documents, no.

21  Q   Okay. Are there any e-mails that you haven't

22  provided?

23  A   No.

24  Q   Did at any time you ask Mr. Dennis Schopf to

25  make you a written statement?

---

1      A   Of?

2      Q   Any written statements, any statements by

3  anybody. Did you say, tell me what happened in your

4  words, write it down for me?

5      A   No.

6      Q   So you have no statements, written statement

7  from anybody?

8      A   No.

9      Q   And the document which you contend is your

10  investigation, is that the last page, that two-sided

11  page of your notes?

12      A   That is what I wrote down, yes.

13      Q   Okay.

14      A   This has been going on, as you know, for seve

15  years there has been plenty of conversation.

16      Q   But as far as your investigation when you

17  received her complaint, that is what you provided today

18      A   Yes.

19      Q   You don't have anything in any kind of diary or

20  logbook or notepad, nothing else?

21      A   No.

22      Q   And you don't know what, if anything, Charleno

23  would have?

24      A   I don't.

25      Q   Okay. I think I've got everything I need today.

1



February 6, 2001

Chevelle Tingen
PO Box 8283
Lancaster, PA 17604-8283

Dear Chevelle:

Enclosed please find Ecklin Group 401K check number 1002 in the amount of $2,226.65 as distribution of your 401K account.

Also enclosed is the final report of your account prepared by Trefsgar & Co., Inc. through November 21, 2000. The report shows a final balance of $6,685.14, which was distributed as follows:

$3,121.46 your loan default amount
$2,226.65 to you in the enclosed check
$1,337.03 withheld for federal taxes

I apologize for the delay in this payment. I thought that Trefsgar & Co, Inc. had made the distribution. I researched the situation upon hearing that you had not received the payment and found that there was a letter sent in November with instructions for the payments that we did not receive.

Trefsgar & Co., Inc. has calculated that interest due since that time is $18.55. Therefore, also enclosed is Ecklin Group check number 7413 in that amount.

If you have any questions feel free to contact me at 392-1771.

Sincerely,


Charlene Kulesa
Office Manager


Certified Mail
Return Receipt Requested

ECKLIN DEVELOPMENT, LLC

| REFERENCE | DATE | GROSS | DISCOUNT | NET |
|---|---|---|---|---|
| 401KINTEREST | Feb 6 01 | 18.55 | 0.00 | 18.55 |

0007413

TOTALS | 18.55 | 0.00 | 18.55

ECKLIN DEVELOPMENT, LLC
P.O. BOX 7385
LANCASTER, PA 17604-7385
PH. 717-392-1771

MELLON BANK
COMMONWEALTH REGION
55-82/313

0007413

Feb 6 01
DATE

NO.

$18.55
AMOUNT

*****************************Eighteen and 55/100 *********************************

PAY
TO THE
ORDER
OF

CHEVELLE TINGEN
PO BOX 8283
LANCASTER, PA  17604-8283

OCT-23-2003   04:40P   FROM:   TO:   Lancaster   P.18/30



# ECKLIN GROUP
## EG 401(k) PROFIT SHARING PLAN
### 1/01/2000 to 11/21/2000

## CHEVELLE M. TINGEN

| | |
|---|---|
| Soc Sec No | 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 |
| Hours | 1,413 |
| Current Status | Term, without a break in service |
| Beneficiary | SOPHIA MARIE DEJESUS |

| | |
|---|---|
| Date of Birth | 05/05/1965 |
| Date of Hire | 06/01/1995 |
| Date of Participation | 01/01/1996 |
| Date of Termination | 07/31/2000 |

### Total by Source

| | | Beginning Balance | Contrib | Divs/Fees/ Cap Gains | Unrealized Gain/Loss | Transfers Loan Pmt | Loan Distr./ Distributions | Ending Balance | Ve Un |
|---|---|---|---|---|---|---|---|---|---|
| Employee Deferrals | $ | 3,787.47 | $ 441.64 | $ 181.36 | $ 3,228.81 | $ 0.00 | ($ 7,639.28) | $ 0.00 | $ |
| Employer Match | $ | 1,930.73 | $ 198.97 | ($ 77.71) | ($ 4.92) | $ 0.00 | ($ 2,047.07) | $ 0.00 | $ |
| Employer Discretionary | $ | 207.38 | $ 0.00 | ($ 8.59) | $ 0.00 | $ 0.00 | ($ 198.79) | $ 0.00 | $ |
| Loans | $ | 0.00 | $ 0.00 | $ 43.90 | ($ 3,243.90) | $ 0.00 | $ 3,200.00 | $ 0.00 | $ |
| Totals | $ | 5,925.58 | $ 640.61 | $ 138.96 | ($ 20.01) | $ 0.00 | ($ 6,685.14) | $ 0.00 | $ |

### Total by Fund

| | | Beginning Balance | Contrib | Divs/Fees/ CapGains | Unrealized Gain/Loss | Transfers Loan Pmt | Loan Distr./ Distributions | Ending Balance | Ve Bal |
|---|---|---|---|---|---|---|---|---|---|
| LOAN | $ | 0.00 | $ 0.00 | $ 43.90 | $ 0.00 | ($ 3,243.90) | $ 3,200.00 | $ 0.00 | $ |
| Shares | | 0.000 | 0.000 | 43.900 | | 0.00 | 3,200.00 | 0.000 | |
| UCL AMERICAN CENTURY ULTRA | $ | 5,925.58 | $ 133.80 | $ 54.47 | $ 0.00 | ($ 923.42) | ($ 5,190.43) | $ 0.00 | $ |
| Shares | | 5,925.380 | 133.800 | 54.470 | | (2,913.85) | (5,190.43) | 0.000 | |
| (9) GROWTH INDEX | $ | 0.00 | $ 0.00 | ($ 2.59) | ($ 20.01) | $ 127.64 | ($ 105.04) | $ 0.00 | $ |
| Shares | | 0.000 | 0.000 | (0.071) | | 3.23 | (105.04) | 0.000 | |
| (30)PRIME MONEY MARKET | $ | 0.00 | $ 506.81 | $ 43.18 | $ 0.00 | $ 4,039.68 | ($ 4,589.67) | $ 0.00 | $ |
| Shares | | 0.000 | 506.810 | 43.180 | | 2,786.21 | (4,589.67) | 0.000 | |
| Totals | $ | 5,925.58 | $ 640.61 | $ 138.96 | ($ 20.01) | $ 0.00 | ($ 6,685.14) | $ 0.00 | $ |

### Allocation Percentages

| Fund Name | Percentage |
|---|---|
| LOAN | |
| UCL AMERICAN CENTURY ULTRA | |
| (9) GROWTH INDEX | 20% |
| (30)PRIME MONEY MARKET | 80% |

### Loan Account

| | | |
|---|---|---|
| Current Balance | $ | 0.0 |
| Principal Repaid | $ | 3,200.0 |
| Interest Paid | $ | 43.9 |

Transgenics, Inc.

# Tretsgar&co., Inc.

November 21, 2000

Ms. Charlene L. Kulesa
Ecklin Group
Box 7365
8 North Queen Street, Third Floor
Lancaster, Pennsylvania 17603

RE:   Ecklin Group
       401(k) Thrift/Profit Sharing Plan

Dear Charlene:

Enclosed is distribution information for Chevelle M. Tingen. As her vested account balance is under $5,000 and she did not respond to our September correspondence, automatic redemption is permitted at this time.

The necessary mutual fund shares have been sold and settled. Using your Vanguard checkbook, kindly write and have R. Ecklin sign the following two checks:

$2,226.65   (1) Chevelle M. Tingen
1,337.03    (2) Your bank for federal withholding
$3,563.68

$3,121.46   Loan default amount
$6,685.14   Total amount as shown on statement

Forward Ms. Tingen's check accompanied by her final certificate.

The check for federal tax must be deposited at your bank using the same remittance sequence as your payroll taxes. You'll also need a 945 federal deposit coupon.

Contact our office if you have any questions.

Sincerely,

Susan Baum

SLB:lcb
Enclosure

Employee Benefit Consultants • 336 Cumberland Street, P.O. Box 1209, Lebanon, PA 17042 / (717) 273-8441 / Fax (717) 273-8357
Investment products available through MONY Securities Corp. Member NASD, SIPC
1740 Broadway, New York, NY 10019 / 1-800-735-0166
Tretsgar & co. Inc. is not an affiliate or subsidiary of MONY Securities Corp.

ECKLIN DEVELOPMENT, LLC

0006471

| REFERENCE | DATE | GRO | DISCOUNT | NET |
|---|---|---|---|---|
| SEC DEP RFND | Mar 28 00 | 350.00 | 0.00 | 350.00 |

| TOTALS | | 350.00 | 0.00 | 350.00 |

ECKLIN DEVELOPMENT, LLC
P.O. BOX 7365
LANCASTER, PA 17604-7365
PH. 717-392-1771

MELLON BANK
COMMONWEALTH REGION
60-02/313

0006471
NO.

Mar 28 00
DATE

$350.00
AMOUNT

****************** Three Hundred Fifty and 00/100 ******************

PAY
TO THE
ORDER
OF     CHEVELLE TINGEN

NON-NEGOTIABLE

# EXHIBIT B

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

CHEVELLE TINGEN,                                    :
                                    Plaintiff       :
                                                    :   CIVIL ACTION No. 02-4663
                    vs.                             :
                                                    :
ROBERT L. ECKLIN, JR., Individually and             :
doing business as ECKLIN DEVELOPMENT                :
GROUP and DENNIS SCHOPF,                            :
                                    Defendants      :

### DECLARATION OF MELISSA OBETZ

I, MELISSA OBETZ, hereby declare that the following facts are true and correct:

1.    I am the Manager of the retail stores Details and Pappagallo.

2.    Details is a retail store located at 30 North Queen Street, Lancaster,

Pennsylvania 17603.

3.    Pappagallo is a women's clothing retail store located at 28 West Orange

Street, Lancaster, Pennsylvania 17603.

4.    The stores are located on the same block in downtown Lancaster.

5.    I have been the full-time Manager of both stores since 1997, including the

years 1999 and 2000.

6.    In 1999, Pappagallo employed one other full-time and two part-time

employees.

7.    In the year 2000, Pappagallo employed two other full-time and no part-time

employees.

8.    In 1999, Details employed one other full-time and one part-time employee.

9.    In 2000, Details employed one other full-time and one part-time employee.

1

10.  I am responsible for the personnel decisions, including hiring and firing of employees, for Details and Pappagallo and held that responsibility in 1999 and 2000.

11.  I am responsible for submitting payroll information to the outside accountants, Sager, Swisher & Company, LLP, for Pappagallo and Details and held this responsibility during 1999 and 2000.

12.  Since I have been Manager, neither I nor any of the employees of Pappagallo and Details have had any involvement in the operations of the Ecklin Group.

I declare, under the penalty of perjury, that the foregoing is true and correct.

_____
Melissa Obetz

Dated:  October 13, 2003

2

# EXHIBIT C

UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

**COPY**

CHEVELLE TINGEN                    :
                                   :
vs.                                :    C.A. NO. 02-CV-4663
                                   :
ROBERT L. ECKLIN, JR., ET          :
AL.                                :

**DEPOSITION OF RUTH ECKLIN**

produced, sworn and examined on August 21, 2003, at 3:45
P.M., at the Law Offices of Nina B. Shapiro, 53 North Duke
Street, Lancaster, Pennsylvania, before:

MARK E. BROWN, RPR-CSR
ANDERSON COURT REPORTING

**APPEARANCES**

For the Plaintiff:

LAW OFFICES OF NINA B. SHAPIRO
53 North Duke Street
Lancaster, PA 17602
BY:  NINA B. SHAPIRO, ESQ.

For the Defendants:

STEVENS & LEE
25 North Queen Street
Lancaster, PA 17608
BY:  GARY D. MELCHIONNI, ESQ.

1
## I N D E X

2
DEPONENT:                                                    PAGE

3
   **RUTH ECKLIN**

4
      Examination by Ms. Shapiro                              3

5

6

7

8
## E X H I B I T S

9
NO.                 DESCRIPTION                              PAGE

10
(RUTH ECKLIN)

11
   A         letter                                           22
   B         deed                                             28
12
   C         deed                                             29
   D         deed                                             30
13
   E         deed                                             30
   F         deed                                             31
14
   G         newspaper article                               33

15

16

17

18

19

20

21

22

23

24

25

1    Q    Any college?

2    A    Yes.

3    Q    Graduate of college?

4    A    Yes.

5    Q    Where did you graduate college?

6    A    University of Iowa.

7    Q    Is that where you're originally from?

8    A    No.

9    Q    And your age, please?

10   A    41.

11   Q    Any Master's?

12   A    No.

13   Q    Any business courses?

14   A    Yes.

15   Q    And what were they in?

16   A    I attended a business course through the Chamber

17   of Commerce.  No outside accredited courses.

18   Q    Now, at some point, you became the owner of

19   Pappagallo's?

20   A    Yes.

21   Q    Was that an existing store before you were

22   operating it?

23   A    Yes.

24   Q    And when did you assume ownership of

25   Pappagallo's?

8

| | | |
|---|---|---|
| 1 | A | 1991. |
| 2 | Q | And for the record, what type of enterprise is |
| 3 | | that? |
| 4 | A | Women's clothing boutique. |
| 5 | Q | And you were operating it in the year 2000? |
| 6 | A | Yes. |
| 7 | Q | And you still operate it? |
| 8 | A | Yes. |
| 9 | Q | And you also operate Details? |
| 10 | A | Yes. |
| 11 | Q | What is Details? |
| 12 | A | Gift and stationary store. |
| 13 | Q | And when did you come to operate that |
| 14 | | enterprise? |
| 15 | A | 1995. |
| 16 | Q | And you're still operating it? |
| 17 | A | Yes. |
| 18 | Q | And you were operating it in the year 2000? |
| 19 | A | Yes. |
| 20 | Q | Are those the only two stores that you operate? |
| 21 | A | No. |
| 22 | Q | What other stores do you operate? |
| 23 | A | Stoner Decorating Center. |
| 24 | Q | And is that located in Quarryville? |
| 25 | A | Yes. |

## CERTIFICATE OF SERVICE

I, JOSEPH D. SHELBY, ESQUIRE, certify that on this date, I served a true and

correct copy of the foregoing SUPPLEMENTAL APPENDIX TO DEFENDANTS' BRIEF IN

SUPPORT OF MOTION FOR SUMMARY JUDGMENT upon the Plaintiff's attorney, via hand

delivery at the following address:

> Nina B. Shapiro, Esquire
> 53 North Duke Street
> Suite 201
> Lancaster, PA 17602

_____
Joseph D. Shelby

Dated: October 13, 2003